**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

WALTER R. MYERS, et al.,

                            Plaintiffs,

v.                                     CIVIL ACTION NO.  2:19-cv-00757

CITY OF CHARLESTON, et al.,

                            Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants City of Charleston (the "City"), Job Ouma ("Ouma"), Erick Miller ("Miller"), and Steve Cooper's ("Cooper") (collectively, "Defendants") Motion for Summary Judgment.[1]  (ECF No. 36.)   For the reasons more fully explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

*I.    BACKGROUND*

This civil action arises out of the death of Adam Myers ("Adam") following an encounter with law enforcement officers on September 12, 2017.  (ECF No. 1–1.)  Plaintiffs are Walter Myers ("Walter"), Vivian Myers ("Vivian"), and the Estate of Adam Myers (the "Estate") (collectively, "Plaintiffs").   The factual background of this action spans two separate days and further brushes upon Adam's medical history.   Therefore, the Court shall begin by reviewing the relevant information concerning Adam, as well as the incidents over September 11 and 12, 2017.

---

[1] Further pending before the Court are the parties' motions to exceed the page limit with respect to the memoranda of law accompanying the summary judgment motion.  (ECF Nos. 35, 40.)   Finding it appropriate to do so, the Court **GRANTS** these motions.

### A. The Decedent, Adam Myers

Adam was diagnosed with schizoaffective disorder in or around October 2014, along with major depression and anxiety. (ECF 36–1 at 4.) While he had been prescribed medication, Adam would neglect to take it regularly, which resulted in him experiencing symptoms including paranoia, delusional thinking, and hallucinations. (ECF No. 41–1 at 6.) Adam had various encounters with law enforcement and other public agencies, including first responders, for suspected drug use, violence, and mental hygiene proceedings. (ECF Nos. 36–8 at 10–17; 36–9 at 1–8.) In one instance, Adam was at the Circuit Court for Kanawha County for a mental hygiene proceeding, where he disarmed a sheriff's deputy and was subsequently tasered multiple times. (ECF No. 36–8 at 14.) In another instance, during a visit to Thomas Memorial Hospital in South Charleston, Adam needed to be transported to "jail" as he had apparently assaulted several nurses, though the charges were eventually dismissed. (ECF No. 36–1 at 8–9.) Despite these occurrences, the Myers family described Adam as "caring, kind, gentle and loving." (ECF No. 41 at 1.)

### B. September 11, 2017

On the evening of September 11, 2017, Adam was in a "downward spiral" and was acting in a "threatening" manner towards his father, Walter. (ECF No. 36–2 at 11–12.) Walter stated that Adam was obviously "distressed," and that Adam "was agitated and kept walking around the house and back and forth on the deck." (Id. at 12.) Vivian called 9-1-1 because Adam was being "aggressive" toward Walter, and "just doing things that were not usual or normal." (ECF No. 41–1 at 9.) During the call, Vivian informed the dispatcher that Adam was not taking his medications for his schizoaffective disorder and that Adam thought that Walter was "trying to do something to

2

him." (ECF No. 41–4 at 1.)  Charleston police officers and medical personnel were dispatched to the scene. (*Id.*)  Vivian reported to the officers and EMTs that Adam was not threatening or homicidal or suicidal. (ECF No. 41–1 at 10.)  Vivian also said that the officers tried talking to Adam but did not discuss a "mental hygiene petition" with either her or Walter. (*Id.* at 9–10.) The entire incident lasted approximately one hour. (ECF No. 41–4 at 1.)  Because Adam denied being homicidal or suicidal, had committed no crime, and did not display any obvious signs of distress, the officers and EMTs left the scene without taking any further action. (ECF No. 41–4 at 4–5.)  Vivian recalled telling the officers before they left that "I hope we don't have to call you back." (ECF No. 41–1 at 10.)

  *C. September 12, 2017*

  Vivian stayed up late with Adam the night of September 11 and into the early morning of September 12 to "watch out for him." (*Id.* at 11.)  After retiring to bed, the next thing that Vivian recalled was Adam "slapp[ing]" her door with an "urgent" need to get something to eat. (*Id.*) While Vivian was preparing a meal for Adam in the kitchen, Adam was "pacing around," like the night before. (*Id.*)  At some point, Adam approached Walter, who was sitting in a reclining chair outside of the kitchen, "and was just kind of staring at him, . . . intently." (*Id.*)  Without any apparent warning, Adam placed his hands around Walter's neck and began struggling with him. (*Id.*; ECF No. 36–2 at 14.)

  At this point, with Adam on top of him, Walter "twisted around in the chair and got down trying to keep him from [getting his hands around Walter's neck]." (ECF No. 36–2 at 14.) Vivian attempted to tell Adam to "[t]ake [his] hands off [Walter]," and tried to get him back into the kitchen to eat. (ECF No. 41–1 at 11.)  Unable to separate Adam from Walter, Vivian called

911.  (*Id.*)  Now on the floor, Walter stated that Adam began "grabbing" at his eyes and bloodied his nose.  (ECF No. 36–2 at 14.)  Vivian was frantically attempting to get Adam off Walter by talking to him, hitting him on his back, and pulling on his shirt.  (ECF No. 41–1 at 11.)

Officers Ouma and Miller were dispatched to the Myers' residence for an "active domestic."  (ECF No. 36–13 at 2.)  The dispatcher alerted the officers that there was an active "Officer Safety Alert" for the Myers' residence, which informed the officers of a suspect—Adam—who would actively fight law enforcement.  (*Id.* at 2; ECF No 36–14 at 2.)  With the information known to the Charleston Police Department (the "Department") at the time, Shift Commander James Duncan ("Duncan") advised both Ouma and Miller to upgrade their response to "Code 3," which includes the use of emergency lights and sirens on their patrol vehicles.  (ECF No. 36–15 at 2.)  While en route, another officer, Corporal Fields, informed Ouma and Miller that Walter Myers "only had one arm and was unable to physically defend himself.[2]"  (ECF No. 36–13 at 2.)

Neither Vivian nor Walter saw the entirety of the interaction between Adam and the responding officers: Vivian was outside the home for the majority of the response, and Walter could not see because he had blood in his eyes.  (ECF Nos. 36–1 at 24; 36–2 at 15.)  Despite neither Walter or Vivian actually seeing what occurred, Officer Ouma wore a body camera during the incident, which recorded the event at issue.[3]  The video shows that Ouma and Miller arrived at the Myers' residence at approximately 12:16 p.m.  (ECF Nos. 36–13 at 2; 36–16(b) at 00:10.)

---

[2] Walter's arm was amputated following an on-the-job accident.  (ECF No. 36–2 at 4–5.)

[3] Officer Chad Sizemore, who reported to the scene shortly after Officers Ouma and Miller, was also wearing a body camera at the time and similarly captured some of these events.  Defendants have attached the separate videos recorded by both Officers Sizemore and Ouma, as well as a combined "side-by-side" video with the timestamps aligned.  (*See generally* ECF No. 36–16.)  To avoid confusion, the Court will reference Officers Sizemore's (ECF No. 36–16(a)) and Ouma's  (ECF No. 36–16(b)) videos separately and will cite to the appropriate timestamps shown on the recordings.

There, the officers found Vivian outside of the home, where she was "crying and screaming." (ECF Nos. 36–13 at 2; 36–16(b) at 00:10.)   Vivian directed the officers into the house, stating that her son, Adam, was still inside.   (ECF Nos. 36–13 at 2; 36–16(b) at 00:10.)

Upon entering the home through the rear entrance, Ouma and Miller observed Walter lying on the floor across the room.   (ECF No. 36–16(b) at 00:35.)   Walter, whom Ouma identifies as the "victim" in his General Investigative Supplementary Report, was "motionless" on the floor in the living room, near the window.   (ECF No. 36–13 at 2.)   Miller was reportedly unable to determine Walter's condition from where they first observed him.   (ECF No. 36–14 at 2.)   The officers then encountered Adam who was "standing to the right of the front door by the wall." (ECF Nos. 36–13 at 2; 36–16(b) at 00:44.)   Ouma reported that he observed Adam with blood on his hands.   (ECF No. 36–13 at 2.)   Miller observed Adam holding a piece of paper in his hands. (ECF No. 36–14 at 2.)   At that time, Adam was given verbal commands by the officers, but refused to comply.   (ECF Nos. 36–13 at 2; 36–14 at 2; 36–16(b) at 00:44.)   Officer Ouma and Miller attempted to detain Adam, and Adam began cursing.   (ECF No. 36–16(b) at 00:54–01:12.) Adam continued to refuse compliance with the officers' verbal commands and "ma[de] it difficult to handcuff" him.   (ECF Nos. 36–13 at 2; 36–16(b) at 01:12–02:45.)   Finally, the officers were able to handcuff Adam while he was still standing.   (ECF Nos. 36–13 at 2; 36–16(b) at 02:45.)

Adam apparently refused to comply with the officers' verbal commands following his handcuffing, so Ouma suggested to Miller that they "put him down."   (ECF Nos. 36–13 at 2; 36–16(b) at 02:45.)   Ouma attempted a leg sweep, but Adam remained standing.   (ECF Nos. 36–13 at 2; 36–16(b) at 02:57.)   Ouma attempted a second leg sweep, and this time, Adam lost his balance, and Ouma and Miller were able to hold him to the ground.   (ECF Nos. 36–13 at 2; 36–

16(b) at 03:01.)   Ouma called for medics at approximately 12:18 p.m.   (ECF Nos. 36–13 at 2; 36–16(b) at 03:27.)   At that time, Miller checked on Walter's well-being, while Ouma stayed with Adam "with [his] hand on Adam's shirt to keep him from fleeing."   (ECF Nos. 36–13 at 2; 36–16(b) at 03:27.)   After several moments, Miller walked over to Adam and Officer Ouma and asked Adam, "you all right, bub?"   (ECF No. 36–16(b) at 05:32.)   Adam answered affirmatively, both with a verbal "yeah" and a grunt.   (*Id.*)   Ouma checked on Adam continuously during this period and reported that Adam "appeared fine."   (ECF No. 36–13 at 2.)

While Ouma kept Adam on the floor, Miller took Ouma's body camera to inspect and document Walter's condition.   (ECF No. 36–16(b) at 05:40.)   Walter was lying on the floor of the living room, directly in front of a window.   (*Id.* at 05:46.)   Walter's face was bloodied from an apparent cut above his eye, and blood covered numerous documents—which appeared to be mail—and stained the carpet next to him.   (*Id.* at 05:51.)   Miller asked Walter if he was okay, to which Walter replied in the affirmative, but that he couldn't see due to the blood in his eyes.   (*Id.* at 05:55–05:59.)   Walter then asked Miller if Adam had his eyeglasses and stated that Adam had taken them, but that Walter did not know what Adam had done with them.   (*Id.* at 06:05–06:08.)   After asking Ouma whether he had found glasses on Adam, Miller then asked Walter if he had lost consciousness at all during the scuffle with Adam, to which Walter responded that he did not think he had.   (*Id.* at 06:17.)   Regarding the cut over his eye, Miller asked Walter how many times Adam had hit him, and Walter responded that Adam had hit him at least once and that he had clawed at his eyes.   (*Id.* at 06:32.)   Miller again asked Walter if Adam had "knocked [him] out," and Walter responded that he had not lost consciousness.   (*Id.* at 06:36.)   Walter added that he "was close a couple times," but maintained that he remained conscious.   (*Id.* at 06:43.)

As Miller checked on Walter, Officer Sizemore responded to the scene and stood near where Ouma had Adam on the floor.  (ECF 36–16(a) at 00:18.)  Officer Sizemore and Ouma searched Adam's pockets in response to Miller's question as to whether Adam had Walter's eyeglasses on his person.  (*Id.* at 00:38–00:42.)  Apparently not finding the eyeglasses, Ouma stood up and removed his hand from Adam's back.  (*Id.* at 00:53.)  Adam remained prone during this time, and his hands moved slightly in their restraints.  (*Id.* at 01:28.)  Several seconds later, Officer Sizemore exited the Myers' residence to locate Vivian.  (*Id.* at 01:46.)  Officer Sizemore found Vivian outside the home and informed her that Walter wanted her to remove the Myers' dog, which had bit the officers and Vivian.  (*Id.* at 02:22.)   Vivian and Officer Sizemore re-entered the residence as Vivian began to call for the dog.  (*Id.* at 02:48.)   In the background, Ouma called Adam's name repeatedly, and then announced that Adam was unresponsive.[4]  (*Id.* at 02:54–02:58.)   Shortly after, Officer Sizemore exited the home and requested medics be dispatched as the officers had "one unresponsive."  (*Id.* at 03:18–03:33.)

While Officer Sizemore exited the house the first time, and as Miller checked in with Walter, Ouma asked Miller "what's his name," regarding Adam.  (ECF No. 36–16(b) at 07:30.)  Believing Ouma to be asking about Walter, Miller responded, "Walter."  (*Id.* at 07:32.)  Ouma began calling Walter's name, but was presumably checking on Adam.  (*Id.* at 07:35–07:51.)  Ouma then, realizing the mistake, asked "what's *this* guy's name," and was told "Adam."  (*Id.* at 07:55–07:58.)  Officer Ouma continued to call out to Adam, this time using the correct name, but received no response.  (*Id.* at 07:58–08:30.)  Ouma then informed Miller that Adam "is not responsive."  (*Id.* at 08:30.)

---

[4] As will be evident, *infra*, the combined video—which syncs the two separate videos—has this moment occurring at approximately 08:30.   (*See* ECF No. 36–16 at 08:30.)

At this point, Miller returned to Ouma and instructed him to roll Adam on his side.   (*Id.* at 8:35.)   After handing the body camera back to Ouma, Miller repositioned Adam so that he was lying on his side.   (ECF Nos. 36–14 at 3; 36–16(b) at 08:47.)   Miller continued to call Adam's name and, failing to get any response, rolled Adam to his back.   (ECF No. 36–16(b) at 08:58.) Miller did not observe Adam breathing, and he could not find a pulse.   (ECF Nos. 36–14 at 3; 36–16(b) at 09:00–09:24.)   Miller then checked Adam's eyes with a flashlight, and he found that Adam's eyes were fixed and dilated, and his pupils were unresponsive to the light.   (ECF Nos. 36–14 at 3; 36–16(b) at 09:24–09:30.)   At that time, Ouma again called for medics and told them to "step it up."   (ECF No. 36–16(b) at 09:50–09:55.)   Miller then began chest compressions on Adam.   (*Id.* at 10:06.)   Medics arrived several moments later and began to work on Adam. (ECF Nos. 36–13 at 2.)

Shift Commander Duncan responded to the scene and arrived as medics loaded Adam into an ambulance.   (ECF No. 36–4 at 9.)   Duncan reported that Adam was still alive at this point, but that he "appeared to be suffering severe medical problems."   (*Id.*)   Duncan coordinated with Captain Abbott, the patrol division commander at the Department, and Lieutenant Hazlet, who dispatched detectives to the scene to begin investigating Adam's assault on Walter.[5]   (*Id.*)   Next, Duncan spoke with both Officers Ouma and Miller, who advised that they had been bitten, albeit not severely, by the Myers' dog.   (*Id.*)   Duncan advised both to "report to the station" and to begin "completing the necessary paperwork."   (*Id.*)

---

[5] During this investigation, detectives reportedly found a syringe containing Fentanyl, a spoon with Fentanyl on it, a straw containing Percocet, a bottle of Ritalin that had been prescribed to a female not present at the home, and a bottle of "pain pills" that had been prescribed to a male not present at the home, all in Adam's bedroom.   (ECF Nos. 36–8 at 9; 36–9 at 8–9; 36–11 at 5.)   Adam did not have any illicit substances in his system at the time of death.   (ECF No. 36–11 at 5.)

Despite receiving medical attention at the scene and being transported to the hospital, Adam passed away at 1:19 p.m. (ECF No. 36–11.)  Adam's autopsy concluded that he had experienced "[s]udden death due to hypertensive cardiovascular disease," secondary to "[h]ypertensive cardiomegaly, marked," "[c]oncentric left ventricular hypertrophy, marked," and "pulmonary edema/congestion/marked."  (ECF No. 36–11 at 5.)  The autopsy concluded that Adam's "sudden death" had occurred as a result of "hypertensive heart disease associated with presumed extensive sympathetic discharge in the setting of being restrained and under police custody."  (*Id.*)  Finally, the medical examiner noted that, following a query with the West Virginia Board of Pharmacy, Adam had no active prescriptions and had had none since August 2016.  (*Id.* at 6.)

### D.  Procedural History

Plaintiffs filed this action in the Circuit Court of Kanawha County, West Virginia, on September 11, 2019.  (ECF No. 1–1.)  Defendants timely removed this action to this Court on October 18, 2019.  (ECF No. 1.)  Plaintiffs originally asserted 19 causes of action against the City of Charleston, Officer Ouma, Officer Miller, former Chief of Police Cooper, and 25 John Does.  (ECF No. 1–1.)  Defendants filed a partial motion to dismiss on November 4, 2019.  (ECF No. 5.)  This Court granted Defendants' partial motion to dismiss on July 21, 2020.  (ECF No. 22.)

Following this Court's July 21 order, seven causes of action remain.  The Estate has asserted claims under 42 U.S.C. § 1983 against Ouma and Miller for unreasonable search and seizure (Count I(a)); deprivation of life or liberty without due process (Count I(b)); and excessive force (Count I(c)).  Walter and Vivian, in their individual capacities, have asserted claims against

Ouma and Miller for intentional infliction of emotional distress (Count VII); against the City, Ouma, and Miller for negligence (Count IX) and the negligent infliction of emotional distress (Count X); and against Cooper and the City for negligent training, supervision, and/or retention (Count XII).   (*See* ECF No. 22.)

Defendants filed the instant motion for summary judgment on October 5, 2020.   (ECF No. 36.)   Plaintiffs timely responded on October 19, 2020.   (ECF No. 41.)   Defendants filed their timely reply in support of the motion on October 26, 2020.   (ECF No. 46.)   With the briefing complete, this motion is ripe for adjudication.

## II.   *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment.   It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact."   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'"   *Guessous v.*

*Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A failure to respond in and of itself, however, does not show that the moving party is entitled to a judgment as a matter of law.   *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).   "Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what is has before it whether the moving party is entitled to summary judgment as a matter of law."   *Id.*; *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . , the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . .").

## III.    DISCUSSION

Defendants argue that they are entitled to summary judgment on all remaining counts asserted by Plaintiffs.   In the interest of expediency, the Court will begin this discussion by addressing Defendants' arguments that Plaintiffs did not respond to.   From there, the Court will analyze the remaining arguments as presented by Defendants, starting with the issue of qualified immunity.

### A.   Count I(a) – Unreasonable Search and Seizure

Defendants argue they are entitled to summary judgment on Plaintiffs' claim of unreasonable search and seizure, brought pursuant to 42 U.S.C. § 1983.   (ECF No. 37 at 13.) First, Defendants assert that Walter, in either his personal capacity or as the representative for the

Estate, does not have standing to sue for anything that happened to Vivian.[6]   (*Id.*)   Further, Defendants argue that there is no evidence that would establish that the officer who applied for the search warrant of the Myers' residence "knew or should have known" that Adam had passed away at the time of the application and that, even armed with such knowledge, such an application would not make the search *per se* unreasonable.   (*Id.* at 13–14.)   Next, Defendants argue that because Adam had already passed three hours before the search took place, neither he nor Walter—as the representative of the Estate—can assert a Fourth Amendment claim.   (*Id.* at 14.)   Finally, Defendants argue that the evidence establishes that Ouma and Miller took no part in the subsequent application for a search warrant or the search itself and, as the only named defendants on this claim, are therefore entitled to judgment as a matter of law.   (*Id.*)   Plaintiffs failed to respond to this argument.

The Fourth Amendment guarantees"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. Amend. IV.   The Fourth Amendment does not proscribe all searches and seizures, but only unreasonable ones.   *United States v. Sharpe,* 470 U.S. 675, 682 (1985).   Generally, a warrant must be secured for a search to be considered reasonable.   *Kentucky v. King*, 563 U.S. 452, 459 (2011).   *See also Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.")

The Court is not altogether certain exactly what is claimed in Count I(a) by the Plaintiffs, other than the obvious assertion that Adam was deprived of his right to be free from unconstitutional searches and seizures.   (*See* ECF No. 1–1 at ¶ 43(a).)   Noting that Plaintiffs have

---

[6] The Court notes that the Complaint asserts that Adam was deprived of the "right to be free from unreasonable searches and seizures," and that neither Vivian nor Walter are named in Count I or its subparts.   (ECF No. 1–1 at ¶¶ 42–44.)

also brought separate claims under § 1983 for excessive force and due process, the Court surmises that Plaintiffs have asserted a claim for unreasonable search.   Therefore, the Court proceeds with the presumption that Plaintiffs claim Adam was subjected to an unreasonable search that occurred only hours after his passing and during the investigation into the malicious wounding of Walter.

In the Complaint, Plaintiffs alleged that Vivian was subjected to questioning at the Department "for an extended period of time" and not allowed to return home.[7]   (*Id.* at ¶ 35.) Plaintiffs further allege that Detective W.R. Anderson[8] made an application for a search warrant to investigate the malicious wounding of Walter, "but fail[ed] to mention that Adam Myers died at the scene prior to . . . making application for said warrant."   (*Id.* at ¶¶ 36–37.)   Thereafter, Plaintiffs allege that Charleston Police Officer A. Kuhner[9] executed the search warrant, which Plaintiffs characterize as "an effort for the Defendants to obfuscate the circumstances surrounding Adam Myers' death."   (*Id.* at ¶ 40.)

However, there has been no evidence developed regarding these allegations, and the facts establish a reasonable search in the investigation of a crime.   To begin, while it is clear that Adam suffered a medical emergency on the scene, multiple witnesses indicated that Adam was still alive when transferred to the ambulance.   (*See* ECF Nos. 36–4 at 4, 5, 8; 36–5 at 10.)   It was during this period that Commander Duncan ordered detectives to the scene to continue the investigation. (ECF No. 36–4 at 9.)   As a part of this investigation, Detective Anderson applied for and received a search warrant to investigate the crime of malicious wounding.   (ECF No. 36–8 at 1–7.)   In

---

[7] Despite this allegation, Count I asserts that only Adam's "constitutionally protected rights" were violated.   (*See* ECF No. 1–1 at 10.)   Therefore, based on the allegations in Count I, the Court does not consider Defendants' assertion that Walter, in either his representative or personal capacity, does not have standing to sue for a violation of Vivian's civil rights.

[8] Detective Anderson is not a named party in this matter.

[9] Officer Kuhner is not a named party in this matter.

support of this search warrant, Detective Anderson asserted that Vivian had told officers that Adam had not taken his medication for several months, and that investigators believed they would find evidence of Adam's schizoaffective disorder medications at the crime scene.  (*Id.* at 6.) This warrant was executed by Officer Kuhner at 4:30 p.m. on September 12, 2017, only mere hours later.  (*Id.* at 9.)  There was virtually no delay in either seeking or executing the search warrant.

Moreover, there has been no evidence presented that any of the officers were made aware of Adam's death prior to either seeking or executing the search warrant.   The lone reference that the Court has been able to locate in the party's filings is that Detective Crowder,[10] an assisting officer to the investigation, was directed to report to CAMC.   (ECF No. 36–5 at 10.)   Once there, Detective Crowder learned that Adam had passed away.  (*Id.*)   Detective Crowder then informed Sergeant Hunt[11] of Adam's passing at "1322 hours."  (*Id.*)   Sergeant Hunt asked Detective Crowder to remain at CAMC while the Charleston Police Crime Scene Unit arrived and completed its investigation.  (*Id.*)  It is unknown what Sergeant Hunt did with this information, but the Court is able to surmise that the investigation continued into Adam's death.   Detective Crowder remained on scene at CAMC until the medical examiner arrived, and the medical examiner informed him that he was waiting to hear from Officer Kuhner, who was, presumably, finishing the search of the Myers' residence.  (*Id.*)  These facts alone, though, are insufficient to create a genuine dispute of material fact that the search of Adam's room was unreasonable or a part of a police cover-up of Adam's death.

---

[10] Detective Crowder is not a party to this suit.

[11] Sergeant Hunt is not a party to this suit.

14

Beyond failing to identify any facts that when construed in their favor demonstrate a genuine issue of material fact, Plaintiffs have similarly not identified any facts that would establish Ouma and Miller were involved in the subsequent search of the Myers' residence.   In fact, Officers Ouma and Miller were directed to return to the police station to begin completing the necessary reports of the incident.   (ECF No. 36–4 at 9.)   Further, and as will be explained by the Court in more detail below, Plaintiffs have also not identified "John Does 1–10," who Plaintiffs asserted Count I against, despite having ample time and opportunity to do so.   This, in combination with the lack of factual evidence above, are ultimately determinative on this claim.

Yet, even if the Court assumes *arguendo* that Plaintiffs established a factual basis or dispute for an unreasonable search, that claim was extinguished by Adam's death.   *See, e.g.*, *Ford v. Moore*, 237 F.3d 156, 165 (2d. Cir. 2001) ("Even if there were a viable claim against Moore for conduct after Ford's death, the death would have extinguished any claim of Ford's."); *Riley v. St. Louis Cnty. of Missouri*, 153 F.3d 627, 629 n.3 (8th Cir. 1998) ("We note that, to the extent that Riley's complaint alleged that Appellees' actions violated her deceased son's constitutional rights, those claims were properly dismissed because section 1983 does not provide a cause of action on behalf of a deceased for events occurring after death."); *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980) ("[T]he civil rights of a person cannot be violated once that person has died."); *Guyton v. Phillips*, 606 F.2d 248, 251 (9th Cir. 1979) (finding that because decedent's civil rights terminated with his death, so too did any alleged conspiracy to deprive him of those rights); *Whitehurst v. Wright*, 592 F.2d 834, 841 (5th Cir. 1979) (finding that alleged deprivation of constitutional rights occurring after decedent's passing did not survive the death of the victim).

15

For the foregoing reasons, Defendants' motion is **GRANTED** as to Count I(a).   Count I(a) is therefore **DISMISSED WITH PREJUDICE** as a matter of law.

### B.   I(b) – Due Process of Law

Defendants next argue for judgment as a matter of law on Count I(c).   (ECF No. 37 at 14.) Count I(c), styled as a claim for a violation of due process of law, overlaps Counts I(a) (unreasonable search) and I(c) (excessive force).   (*See* ECF No. 1–1.)   As a result, Defendants argue that Count I(b) "is not cognizable under these circumstances," as the claim should be analyzed under the Fourth Amendment and not the "rubric of substantive due process."   (ECF No. 37 at 14 (quoting *Spry v. West Virginia*, No. 2:16-CV-01785, 2017 WL 440733, at *6 (S.D. W. Va. Feb. 1, 2017).)   Plaintiffs failed to respond to this argument.

The Supreme Court holds that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."   *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).   In *Graham*, the Supreme Court held that where an explicit textual source of constitutional protection applies to physically intrusive government conduct, "that Amendment, not the more generalized notion of 'substantive due process,'" must be the guidepost for analyzing the claim.   490 U.S. at 395; *see Vathekan v. Prince George's Cty.*, 154 F.3d 173, 177 (4th Cir. 1998) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." (citation and internal quotation marks omitted)).

16

Under *Graham*, a claim of due process may not be entertained where Plaintiffs advance a Fourth Amendment claim "arising from the same abusive government conduct." *Spry*, 2017 WL 440733, at *6. *See also Krein v. W. Va. State Police*, No. 2:11-cv-00962, 2012 WL 2470015, at *6 (S.D. W. Va. Jun. 27, 2012) (dismissing Fourteenth Amendment claim because "the textually specific Fourth Amendment protection preempts the more generalized substantive due process protection"); *see also Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (turning to an analysis of substantive due process in consideration of an excessive force claim only after finding that the Fourth and Eighth Amendments did not apply); *Love v. Salinas*, No. 2:11-cv-00361-MCE-CKD, 2013 WL 4012748, at *7 n. 5 (E.D. Ca. Aug. 6, 2013) ("Because Plaintiff's 'failure to protect' claim is based on the Eighth Amendment, no separate discussion of Plaintiff's substantive due process claim . . . is necessary.")

Plaintiffs have advanced both an excessive force claim and an unreasonable search claim, as well as the instant due process claim, all stemming from the same incident involving the Department. (*See* ECF No. 1–1.)  The Fourth Amendment provides the specific text under which those claims must be analyzed, not the more generalized substantive due process approach. *See Graham*, 490 U.S. at 395.  Plaintiffs' claim of a substantive due process violation, therefore, may not be entertained by the Court.  *Spry*, 2017 WL 440733, at *6.

For the foregoing reasons, Defendants' motion is **GRANTED** as to Count I(b). Therefore, Count I(b) is **DISMISSED WITH PREJUDICE** as a matter of law.

### C.  Count IX – Negligence

Defendants argue that they are entitled to summary judgment on Count IX, which is a state-law claim of negligence asserted against Officers Ouma and Miller and the City.

Defendants argue that this negligence claim fails because Plaintiffs have failed to establish or identify any duty that the Defendant officers had on either day they interacted with Adam.[12] (ECF No. 37 at 19.)   Further, they argue, Ouma and Miller cannot be liable for anything that happened or did not happen on September 11, 2017, as they were not present at the scene.   (*Id.* at 20.)   Defendants assert that Plaintiffs have also not alleged or established any exception to statutory qualified immunity or that liability is expressly imposed by another provision of the West Virginia Code.   (*Id.*)   Further, Defendants note that Count IX is brought by Walter and Vivian individually, but allege that a duty of care was owed to Adam, which would necessarily mean that Walter and Vivian lack standing to bring the claim themselves.   (*Id.* at 21.)   Finally, Defendants argue that, as to the City, it is immune from liability pursuant to West Virginia Code § 29-12A-5(a)(5) because Plaintiffs' claim originates from the method of providing police protection.   (*Id.*)   Plaintiff have failed to respond to this argument.

While "[t]he general rule of construction in governmental tort legislation cases favors liability, not immunity," political subdivisions are liable for losses resulting from their employees' negligence "[u]nless the legislature has clearly provided for immunity under the circumstances." Syl. pt. 2, *Marlin v. Bill Rich Const., Inc.*, 482 S.E.2d 620 (W. Va. 1996).   Even though a municipality may be liable for certain negligent acts of its employees under West Virginia Code § 29-12A-4(c)(2), West Virginia Code § 29-12A-5(a)(5) establishes that a political subdivision is immune from liability if the claim asserted against it results from "a failure to provide, or the method of providing, police, law enforcement or fire protection."

---

[12] While Count IX is only asserted against the named parties above, Defendants argue that none of the "John Doe" officers similarly had a duty of care to either have taken Adam into custody on September 11 or "to have acted or refrained from acting in any particular way."   (ECF No. 37 at 19.)

In the matter at hand, there can be no question that the claim of negligence against the City arises out the method of providing police protection.  *See Taylor v. Clay Cnty. Sheriff's Dept.*, Civ. Action No. 2:19-cv-00387, 2020 WL 890247 at \*5–\*6 (S.D. W. Va. Feb. 24, 2020).   Vivian called 911 to get assistance in controlling Adam, who had just attacked his father.   (*See* ECF No. 41–1 at 11.)   Officers of the City of Charleston responded, secured the scene, and investigated the reported criminal activity.   (*See, e.g.*, ECF No. 36–4 at 9.)   On this basis alone, the City is entitled to the statutory grant of immunity and therefore, summary judgment on Plaintiff's negligence claim as well.

Similarly, Officers Ouma and Miller are entitled to statutory immunity on Plaintiff's claim of negligence.   West Virginia Code § 29-12A-5(b) grants employees of a political subdivision immunity from liability except for in three instances: Where (1) the employee's "acts or omissions were manifestly outside the scope of employment or official responsibilities;" (2) the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) [l]iability is expressly imposed upon the employee by a provision of this code."

Here, there has been no evidence developed that Ouma and Miller's actions were manifestly outside the scope of employment or official responsibilities or that their actions were with malicious purpose, in bad faith, or in a wanton or reckless manner.   In fact, Plaintiffs specifically alleged that Ouma and Miller's actions were acting within the scope of their employment when they responded to the Myers' residence on September 12.   (ECF No. 1–1 at ¶ 87.)

Finally, Plaintiffs have failed to show that the City or the officers owed them a special duty of care.   A duty of care is "[o]ne of the primary elements" of a negligence claim.   *Helmbright v.*

19

*Davis*, Civ. Action No. 5:04CV69, 2006 WL 160310 at *5 (N.D. W. Va. Jan. 20, 2006) (citing *Holsten v. Massey*, 490 S.E.2d 864, 869 (W. Va. 1997)). "Providing police protection runs ordinarily to all citizens and is to protect the safety and well-being of the public at large; therefore, absent a special duty to the plaintiff(s), no liability attaches to a . . . police department's failure to provide adequate fire or police protection." *Holsten*, 490 S.E.2d at 869. *Holsten* set forth the following test for identifying the "special relationship" exception to the public duty doctrine articulated above:

> To establish that a special relationship exists between a local governmental entity and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

*Id.* at 870.

Plaintiffs have failed to show that there was a special relationship between themselves, Adam, and the defendant officers that would trigger the "special relationship" exception to the public duty doctrine. Plaintiffs have not produced evidence of any promises or actions by the Defendants for the Court to find that Defendants took on an affirmative duty to act on their behalf. Even if the City and Officers Ouma and Miller were not entitled to statutory immunity on the negligence claim, Plaintiffs' claim would still not be sufficient to overcome the public duty doctrine.

For the foregoing reasons, Defendants' motion is **GRANTED** as to Count IX. Therefore, Count IX is **DISMISSED WITH PREJUDICE** as a matter of law.

### D.  John Does

Defendants next argument asks for judgment in their favor on all claims asserted against "John Does," unnamed officers whom the Plaintiffs sued in this action.   (ECF No. 37 at 24–25.) Plaintiffs sued 25 unnamed individuals—John Does—in this action who remain unnamed.   (*See* ECF No. 1–1.)

"The idea of an unnamed defendant is contrary to the Federal Rules of Civil Procedure." *Price v. Marsh*, Civ. Action No. 2:12–cv–05442, 2013 WL 5409811 at *3 (S.D. W. Va. Sep. 25, 2013).   Rule 10(a) of the Rules of Civil Procedure provides that "[t]he title of the complaint must name all the parties."   "Nowhere do the Rules allow or even mention actions against unnamed defendants." *Price*, 2013 WL 5409811 at *3.   Indeed, the Fourth Circuit has disfavored the designation of John Doe defendants in federal courts. *See Njoku v. Unknown Special Unit Staff*, No. 99–7644, 2000 WL 903896 (4th Cir. July 7, 2000).   Nonetheless, the Fourth Circuit has allowed lawsuits to proceed against John Doe defendants where the "true identity of an unnamed party can be discovered through discovery or through intervention by the court." *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir.1982); *see also Gordon v. Leeke*, 574 F.2d 1147, 1151–53 (4th Cir.1978) (reversing summary judgment where a pro se plaintiff had not initially named the defendants and stating that the plaintiff "should have been granted the opportunity to disclose the identity" of the defendants).   Still, a John Doe defendant must be identified by the time the issues are adjudicated on their merits, as the Fourth Circuit has determined that judgments may not be entered against unnamed defendants. *See Njoku*, 2000 WL 903896 at *1 (stating that "there is no basis to permit a judgment against an unidentified John Doe defendant to be sustained").

Plaintiffs here have had more than ample time to discover, disclose the identities of, and serve the 25 John Does designated in their complaint.   In fact, the Court's own recitation of the facts names multiple officers on the scene on September 12, and yet, Plaintiffs have not served any additional defendants pursuant to Rule 4 of the Rules of Civil Procedure.   Because these 25 John Does have not been served and cannot have a judgment entered against them, they must be dismissed from this action.

For the foregoing reasons, Defendants' motion is **GRANTED** as to the 25 John Does in the complaint.   Therefore, the 25 John Does are hereby **DISMISSED** from this action.

### E.   Count I(c) - § 1983 Excessive Force

Defendants next raise qualified immunity on Plaintiffs' claim for excessive force brought pursuant to 42 U.S.C. § 1983.   (ECF No. 37 at 11–12.)   Because immunity is a "threshold issue," the Court must address its applicability before considering any of the "proffered substantive bases for summary judgment."   *Weigle v. Pifer*, 139 F.Supp.3d 760, 768 (S.D. W. Va. 2015) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("Where [a] defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.")).

### 1.   Qualified Immunity

Qualified immunity is "an immunity from suit rather than a mere defense to liability."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).   *See also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("We repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."); *accord Robinson v. Pack*, 679 S.E.2d 660 (W. Va. 2009)("We agree with the

United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial.").  "However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso,* 206 F.3d 711, 715 (6th Cir. 2000).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Fourth Amendment and the volumes of case law interpreting it establish that individuals have a constitutional right to be free from excessive force during the course of an arrest. *See  Graham  v.  Connor*, 490 U.S. 386; *accord Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("The Fourth Amendment's right to be free from unreasonable seizures includes the right to be free from seizures carried out with excessive force.").  Therefore, in the case at hand, whether qualified immunity shields Ouma and Miller from liability under § 1983 depends on whether the force employed during Adam's detainment was excessive.

Police officers are protected by qualified immunity even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right.  *Pearson*, 555 U.S. at 231–32.  Courts, while retaining discretion in their analyses, are advised to ask whether a constitutional violation occurred and whether the right violated was clearly established.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  *See also  Smith v. Ray*, 781 F.3d 95, 106, n.3 (4th Cir. 2015) ("Courts are 'permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'")

"A constitutional right is 'clearly established' when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). While a clearly established right does not require a case that is factually "on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"The inquiry into reasonableness is an objective one."  *Weigle*, 139 F.Supp.3d at 769. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.  "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'"  *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (quoting *Graham*, 490 U.S. at 396–97).

The Department policy dictates the use of handcuffs when restraining a person.  (ECF No. 43 at 54.)  It reads as follows:

> Officers shall handcuff (double-locked except when the prisoner or the surrounding circumstances and/or officer safety issues reasonably prevent double-locking) all prisoners with their hands behind their back and palms facing outward. Emergency circumstances may require deviation from this standard.
> - Officers should avoid the use of prone restraint techniques, if possible.
> - If the subject is face down, as soon as possible after handcuffing get him/her off of their stomach by either placing them in a seated position or on their side, whichever best facilitates the subject's ease of breathing.

24

- If the struggle continues after the subject has been restrained, do not sit or kneel on their back.   Hold their legs down or secure their legs with leg or ankle restraints.

(*Id.*)

The video of this incident, as well as the parties' own divergent characterizations of the incident, reveals genuine issues of material fact that make qualified immunity inappropriate in this matter.   First, it is clearly established that handcuffing a subject and forcibly keeping him in a prone position, absent further resistance, constitutes excessive force.   *See, e.g.*, *McCue v. City of Bangor, Maine*, 838 F.3d 55, 64–65 (1st Cir. 2016); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008); *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004);   *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–57 (9th Cir. 2003); *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) (denying qualified immunity to police officers who entered an inmate's cell, placed the inmate in a neck hold, and put strong pressure upon his chest, where the custodial death report attributed the inmate's death to asphyxia as a result of trauma to the neck sustained during the struggle, and a physician's report suggested that the inmate may have died as a result of asphyxiation due to the pressure on his chest).   The Court's own research has been unable to locate any Fourth Circuit precedent exactly on point, but as the Supreme Court has instructed, an exact replica of the facts of this case is not needed for such a determination. *See al-Kidd*, 563 U.S. at 741.

However, the Fourth Circuit has reasoned that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity."   *Bailey v. Kennedy*, 349 F.3d 731, 744–

45 (4th Cir. 2003) (quoting *Jones v. Buchanan*, 325 F.3d 520, 531–32 (4th Cir. 2003)). Therefore, the Court remains unpersuaded by the Defendants' assertion that Plaintiffs "have had years to come up with controlling authority but failed to do so." (ECF No. 46 at 14.) Indeed, for quite some time and continuing, courts around the country have recognized and spoken at length of the dangers of exerting force on a prone and handcuffed individual. *See, e.g.*, *Agster v. Maricopa Cnty. Sheriff's Office*, 144 Fed. App'x. 594 at 596–97 (9th Cir. 2005); *McBeth v. City of Union*, Civ. Action No. 7:15-1473-BHH, 2018 WL 4594987 at *14–*15 (D.S.C. Sep. 25, 2018); *Hopper v. Montgomery Cnty. Sheriff*, 310 F.Supp.3d 911, 929 (S.D. Oh. 2017); *Gary v. City of North Chicago*, 160 F.Supp.3d 1035, 1042 (N.D. Ill. 2016); *Sweatt v. Doxtrader*, 986 F.Supp.2d 886, 898 (E.D. Mich. 2013); *Howe v. Town of North Andover*, 854 F.Supp.2d 131, 143 (D. Mass. 2012); *Pirolozzi v. Stanbro*, No. 5:07-CV-798, 2008 WL 1977504 at *11–*12 (N.D. Oh. 2008). Under those circumstances where a suspect is detained and is no longer actively resisting or a flight risk, the use of force in keeping him in a prone position is a violation of a clearly established right.

Moreover, the Department's own policies also recognize the potential danger of keeping a handcuffed person in a prone position for any period of time, undercutting the Defendants arguments. (ECF No. 43 at 54.) Officer Ouma recognized as much, acknowledging that officers should avoid using "prone restraint techniques, if possible." (ECF No. 42 at 32–33.) Ouma also testified that the Department's policy mandates that officers are "to use the least amount of force to effectuate an arrest or detain persons." (*Id.* at 32.) Ouma was no doubt familiar with the Department's "Use of Force Policies," as he had read them before, was trained on them, and continues to read them "whenever [he] can." (*Id.*) In light of the precedent of the Fourth Circuit,

that of multiple jurisdictions nationwide, and the Department's own policies, the Court concludes that this constitutional right is clearly established.

Next, the Court considers whether the officers' actions were objectively reasonable in light of the facts and circumstances.   A review of these facts further persuades the Court that qualified immunity is not appropriate in this case.   The parties do not dispute that Vivian contacted law enforcement for assistance with Adam, who had physically assaulted and injured Walter.   (ECF No. 41–1 at 11.)   Nor do the parties dispute that Officers Ouma and Miller received the "Officer Safety Alert" from dispatch, (ECF Nos. 36–13 at 2; 36–14 at 2); upgraded their response to Code 3, involving lights and sirens, (ECF No. 36–15 at 2); and were advised that Walter was physically handicapped, (ECF No. 36–13 at 2.).

At this point, the parties begin to diverge in their interpretation of the facts, but the video assists in providing the Court with an accurate depiction of the incident.   Upon entering the Myers' residence and after having only just interacted with a "crying and screaming" Vivian, (ECF Nos. 36–13 at 2; 36–16(b) at 00:10), Officers Ouma and Miller are confronted with Walter, laying across the room and bleeding, and Adam to their immediate right with blood on his hands.   (ECF Nos. 36–13 at 2; 36–16(b) at 00:44.)   Adam is then handcuffed, but not without resisting Ouma and Miller's attempts to do so.   (ECF Nos. 36–13 at 2; 36–16(b) at 00:44–02:45.) Immediately after Adam had been successfully handcuffed, he was still physically resisting the officers.   (ECF Nos. 36–13 at 2; 36–16(b) at 2:45.)   At this time, Ouma "put him down" with a leg sweep, and Adam remained in a prone position for the next five to six minutes.   (ECF No. 36–16(b) at 02:45–08:35.)   Based on only the foregoing, the basis for some force in effectuating the arrest or simply controlling the scene is evident.

27

However, during the time Adam is placed and left in a prone position, Ouma and Miller did not frisk Adam for weapons; search the home for any other suspects or potential dangers; or roll Adam to his side, per Department policy.   Moreover, Adam did not appear to continue to resist once prone, and he did not appear at any time to attempt to flee the arresting officers.   The officers did not take these actions despite citing the possibility of Adam fleeing, possessing a weapon, or the presence of other individuals in the residence as concerns to the officers' safety.   (*See* ECF No. 37 at 16.)   Rather, Officer Miller appeared to calmly check on Walter, while Officer Ouma remained near Adam.

Further, Officer Ouma admitted that his training, specific to individuals with mental illnesses, required him "to take more time than you would with someone without a mental illness," because an officer's presence "may cause them to react a different way."   (ECF No. 42 at 12.) Essentially, this meant a focus on "de-escalation" with these individuals, so that officers could "intelligently deal with them."   (*Id.* at 13.)   Similarly, Plaintiff's expert witness is prepared to offer testimony relating to the handling of individuals with mental illnesses and how the officers' interactions in the matter at hand fell short of that standard.   (*See* ECF No. 44–3 at 2–3.)   An individual's diminished capacity must always be a factor considered when detaining that individual, and the evidence indisputably shows that the officers were aware of Adam's status. *See Champion*, 380 F.3d at 904.

But, most importantly, the parties disagree on facts relating to laying Adam prone and keeping some amount of pressure on him while he lay prone and handcuffed.   As was previously discussed, the application of force to Adam while handcuffed in a prone position is a violation of a clearly established right.   *See McCue* 838 F.3d at 64–65; *Weigel*, 544 F.3d at 1155; *Abdullahi*,

423 F.3d at 769; *Champion* 380 F.3d at 903; *Drummond*, 343 F.3d at 1056–57. Plaintiffs' experts have also presented opinions both as to the inappropriate level of force applied and Adam's cause of death. (*See* ECF No. 44–3 at 2–3, 27.) Taking the facts in the light most favorable to Plaintiffs, Plaintiffs can show that the officers' actions were not objectively reasonable. *See Henry v. Purnell*, 652 F.3d 524, 533 (4th Cir. 2011). Therefore, based on the evidence presented, Plaintiffs have sufficiently demonstrated such genuine issues of material fact that qualified immunity is inappropriate in this matter.

### 2. Excessive Force

Because the Defendants are not entitled to qualified immunity, the Court now turns to the substance of the excessive force claim itself. *See Saucier*, 533 U.S. at 204 ("The inquiries for qualified immunity and excessive force remain distinct[.]") Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. This balancing requires the consideration of the facts "from the perspective of a reasonable officer on the scene," without the "20/20 vision of hindsight." *Id.* at 397. The officer's motivation or intent is not considered, but rather "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97). "In answering this question, we consider several factors, including 'the severity of the crime at issue,' whether the 'suspect pose[d] an immediate threat to the safety of the officers or others,' and whether the suspect was 'actively resisting arrest or attempting to evade arrest by flight.'" *Hupp v. Cook*, 931 F.3d

307, 322 (4th Cir. 2019) (quoting *Graham*, 490 U.S. at 396).   "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

In this instance, there remains genuine issues of material fact regarding the force used in Adam's detainment and subsequent passing.   To begin, the Court does not believe there to be anything improper or excessive about the force used to initially detain Adam.   As has been established, police were dispatched to an active domestic, in which they were informed that the residence to which they were dispatched had an officer safety alert for an individual known to fight law enforcement; the victim was a septuagenarian amputee who would have trouble defending himself; and were advised to "step up" their response to a "Code 3."   (ECF Nos. 36–13 at 2; ECF No. 36–15 at 2.)   Once at the Myers' residence, officers were greeted by a "crying and screaming" Vivian; a bloodied Walter; and Adam, who was observed by the officers with blood on his hands and standing near several doors that could have served as exits if Adam had fled.   (ECF Nos. 36–13 at 2; 36–16(b) at 00:10–00:44.)   Adam then actively resisted the officers' verbal commands and physical attempts to restrain him, at least before officers were able to successfully handcuff him.   (ECF Nos. 36–13 at 2; 36–16(b) at 00:44–02:45.)   Faced with a possible assault,[13] a bloodied victim, and a suspect who had an officer safety alert issued upon him and who resisted the officers' attempts to detain him, the force utilized by the officers up until this point was not

---

[13] Defendants repeatedly refer to Adam's assault on Walter as a "malicious wounding" or a "malicious assault."   (*See, e.g.*, ECF No. 37 at 10, 13, 16.)   While no criminal charges were ever brought because of Adam's passing, the Court believes this to be a reference to W. Va. Code § 61-2-9(a), which establishes that "[i]f any person maliciously . . . wounds any person, . . . he or she, . . . is guilty of a felony[.]"   The Court further notes that W. Va. Code § 61-2-9(c) establishes the misdemeanor crime of battery, when a person "unlawfully and intentionally causes physical harm to another person[.]"   While the Court does not speculate on what charges could have been brought or proved, if any, against Adam had he survived, the Court remains cognizant of the distinction between the two crimes, as well as Adam's mental illness.

excessive.  *See Smith v. Garrett*, 586 F.Supp. 517, 523 (N.D. W. Va. 1984) (excessive force not found where suspects were "hostile and uncooperative" and physically resisted and obstructed arresting officers).

After this point, however, genuine issues of material fact exist such that summary judgment is inappropriate.  The parties, as previously evidenced, diverge greatly on their interpretation of these facts, and the recordings of the incident leave some doubt as to what actually happened, as Officer Miller took Ouma's body camera for several minutes and Officer Sizemore exited the home.  In other instances, the camera is blocked such that a clear view of the scene is impossible.  One issue, for example, is whether Adam actively resisted Officers Ouma and Miller after being handcuffed, such that Ouma's leg sweep was an appropriate use of force.  (*See* ECF 36–16(b) at 03:01.)  Or was Adam already compliant and in a seated position prior to this leg sweep, rendering it excessive?  (ECF No. 41 at 9.)  *See, e.g.*, *Johnson v. City of Fayetteville*, 91 F.Supp.3d 775, 803 (E.D.N.C. 2015) (finding leg sweep of suspect not resisting arrest to be unlawful use of force).

The same applies for the officers leaving Adam in a prone position for nearly six minutes while handcuffed.  Officer Ouma can be seen applying some level of force to Adam's back while keeping him prone when Officer Sizemore arrives on the scene, and Adam did not appear to be actively resisting.  (ECF No. 36–16(a) at 00:00–00:49.)  But Sizemore then exits the residence and does not return until Adam is declared unresponsive by Ouma.  (*Id.* at 01:53–03:08.)  Similarly, Officer Ouma's body camera is taken by Miller to check on Walter, meaning there is not clear video evidence of what transpired in those critical few minutes.  (*See generally* ECF No. 36–

16(b).)   *See, e.g.*, *Abdullahi*, 423 F.3d at 775 (finding issue of material fact where direct evidence was unclear as to force where officer kneeled into decedent's back).

Still, what is known is that Adam was kept in the prone position while handcuffed, against Department policy, and subsequently died.   Adam did not appear to be actively resisting the officers once handcuffed; did not attempt to flee; and did not appear to be a threat to the officers. The officers claim that Adam did in fact remain a threat, (see ECF No. 37 at 17), but despite citing their numerous concerns, the officers did not frisk Adam for weapons and did not sweep the house for other potential suspects or dangers.   (*See* ECF Nos. 36–16(b); 42 at 33.)   In fact, the officers were not alerted that anyone else at the residence besides "the father, the son, and the wife [who] were involved."   (ECF No. 42 at 33.)   And, despite not taking any of these actions, they did not immediately roll Adam to his side.   (*See* ECF No. 36–16(b).)   Simply stated, these questions of fact are best left to the jury.   Upon the evidence presented, a reasonable jury could conclude that it constituted excessive force to leave or keep a mentally-ill individual handcuffed and face down, especially after the suspect had ceased resisting. *See Weigel*, 544 F.3d at 1153 ("[T]here is evidence that for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death. If true, this constitutes an unreasonable use of force under the Fourth Amendment.")

Therefore, the Court concludes that summary judgment on Count I(c), excessive force, is inappropriate.   While law enforcement certainly had legitimate interests in protecting the safety of the officers and arresting Adam on suspected assault, the totality of the circumstances presents unanswered questions of material fact, specifically as it pertains to the officers taking Adam to the

floor and keeping him in a prone and handcuffed position for nearly six minutes.   For the foregoing reasons, Defendants' motion is **DENIED** as to Count I(c).

### F.   Count VII – Intentional Infliction of Emotional Distress

Defendants next argue that they are entitled to summary judgment on Count VII, asserted by Vivian and Walter against Ouma and Miller, because the officers did not act in a way that was "so extreme and outrageous as to exceed the bounds of decency."   (ECF No. 47 at 17.)   Plaintiffs counter that they have produced ample evidence that Ouma and Miller's actions were extreme and outrageous when excessive force was used on "a secured, incapacitated and mentally ill person in the presence of his parents."   (ECF No. 41 at 32.)

Under West Virginia law, to prevail on a claim of intentional infliction of emotional distress ("IIED"), otherwise known as the tort of outrage, a plaintiff must prove the following four elements:

> (1) the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, *Travis v. Alcon Laboratories, Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998).   The standard for proving IIED is extremely high, and the West Virginia Supreme Court of Appeals has repeatedly held that "liability depends upon whether the conduct has been so extreme and outrageous 'as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"   *Philyaw v. Eastern Associated Coal Corp.,*   633 S.E.2d  8  (W.Va.  2006) (quoting *Johnson v. Hills Dep't Stores,*   488  S.E.2d 471, 474 (W.Va.

1997)).   The West Virginia Supreme Court explained further that "[w]hether conduct may reasonably considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination."   Syl. pt. 4, *Travis*, 504 S.E.2d at 421.

Viewing the facts and the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find that the conduct demonstrated by the officers was outrageous.   As has been exhaustively documented, Adam was forcefully handcuffed and kept in a prone position, against Department policy, for a period of nearly six minutes.   (ECF No. 36–16(b) at 02:45–08:35.)   This occurred despite the appearance that Adam had ceased resisting and did not pose an immediate danger to the officers.   These actions were taken in the direct presence of Adam's parents, Vivian and Walter, who witnessed Adam's medical emergency firsthand.[14] While the Court recognizes that this is an admittedly close question, a reasonable jury could conclude that the officers' actions were so atrocious, intolerable, and so extreme and outrageous that they exceeded all possible bounds of decency.   *See Honaker v. Town of Sophia*, 184 F.Supp.3d 319, 328 (S.D. W. Va. 2016) (denying summary judgment where law enforcement kicked and stomped suspect after he was handcuffed and offering no resistance and pursued charges based on mischaracterization of incident); *Weigle v. Pifer*, 139 F.upp.3d 760, 779 (S.D. W. Va. 2015) (finding summary judgment inappropriate where law enforcement disputedly used a taser on suspect following his arrest);   Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' claim of IIED.   Therefore, for the foregoing reasons, Defendants' motion is **DENIED** as to Count VII.

---

[14] The parties have not argued or presented any evidence regarding the emotional distress factor annunciated in *Travis*, and the Court is unable to discern from the record before it the extent of such distress.

### G.  Count X – Negligent Infliction of Emotional Distress

Defendants next move for summary judgment on Plaintiffs' claim of negligent infliction of emotional distress ("NIED"), arguing that Plaintiffs cannot prove that Adam died as a result of the officers' conduct, or that even if Adam did die as a result, that the officers' conduct was negligent. (ECF No. 37 at 22.)   Moreover, Defendants' assert that, to the extent that Ouma and Miller are sued in their individual capacities, W. Va. Code § 29–12A–5(b) precludes simple negligence claims.   (*Id.*)   Plaintiffs respond that they have sufficiently shown that Vivian and Walter were close relatives of Adam; that they were located at the scene of his death, and the officer's actions caused Adam's death; that Adam did in fact die; and that they have suffered severe emotional distress because of his death.   (ECF No. 41 at 33–34.)

"To prove negligent infliction of emotional distress, a plaintiff is required to show (1) that the defendant engaged in negligent conduct; (2) that the plaintiff suffered serious emotional distress; and (3) that the defendant's negligent conduct was a cause of the serious emotional distress." *Mowery v. Logan Cnty. Bd. of Educ.*, Civ. Action No. 2:11-cv-00050, 2012 WL 895921 at *6 (S.D. W. Va. March 15, 2012) (citing *Stump v. Ashland, Inc.,* 499 S.E.2d 41, 46 (W.Va. 1997)).

Count X, asserted against Officers Ouma and Miller, as well as the City of Charleston, alleges that "Officer Ouma and Officer Miller [] negligently, recklessly and wrongfully inflicted severe emotional distress on Adam Myers and the Plaintiffs . . . and/or were certain or substantially certain that such distress would result from their conduct."   (ECF No. 1–1 at ¶ 90.)   The allegations in Count X also contain the legal standard for IIED, instead of the above test for NIED.

(*Id.* at ¶ 91 ("The conduct of the defendants was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community.").)

These allegations are important because they are based entirely on the officers' seizure and detainment of Adam, and the parties have developed no other evidence indicative of negligence. As this Court and others have repeatedly held, a plaintiff "[cannot] prevail on a claim of simple negligence based on [a defendant's] intentional act." *Smith v. Lusk*, 533 Fed. App'x. 280, 284 (4th Cir. 2013) (citing *Stone v. Rudolph*, 32 S.E.2d 742, 748 (W. Va. 1944) (noting that "intentional acts are not encompassed by general negligence principles")). *See also Rhodes v. King*, Civ. Action No. 2:19-cv-00626, 2020 WL 4607323 at *4 (S.D. W. Va. Aug. 11, 2020) ("Plaintiff has essentially asserted a claim of excessive force under the Fourth Amendment, under which Defendant King's conduct is, logically, an intentional act."); *Weigle v. Pifer*, 139 F.Supp.3d 760, 780 (S.D. W. Va. 2015) ("A mere allegation of negligence does not turn an intentional tort into negligent conduct.")

"Conduct that supports a negligence claim can be distinguished from conduct that supports an intentional tort claim by examining the subjective intent of the alleged tortfeasor." *Weigle*, 139 F.Supp.3d at 780.   Plaintiffs' claims and evidence presented are all based on the officers' intentional act of seizing Adam.   Indeed, the thrust of this action is the claim that Ouma and Miller used excessive force in making the seizure.   The seizure itself must be and is an intentional act. *See Brower v. City of Inyo*, 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, . . . but the detention or taking itself must be

willful.")  "Intentional torts, as distinguished from negligent or reckless torts . . . generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'"  *Kawaauhau v. Geiger*, 523 U.S. 57, 62, (1998) (emphasis in original) (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The Plaintiffs' complaint and the record before the Court show that the officers intended their actions in effecting the seizure of Adam.  In other words, the officers took deliberate and intentional actions for the purpose of detaining Adam and securing the scene.  *See Weigle*, 139 F.Supp.3d at 780.  Therefore, while the officers' conduct may rise to the level of an intentional tort, said conduct cannot also support a claim based in negligence.  *Id.*; *see also Smith*, 533 Fed. App'x. at 284 ("[P]laintiffs could not prevail on a claim of simple negligence based on Lusk's intentional act."); *Brown v. J.C. Penney Corp.*, 521 Fed.App'x. 922, 924 (11th Cir. 2013) (per curiam) ("A claim for negligence cannot be premised solely on a defendant's alleged commission of an intentional tort.")  Plaintiffs' claim for NIED fails as a matter of law because there is no genuine dispute that the actions complained of were intentional acts.

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Count X, the negligent infliction of emotional distress.  Count X is hereby **DISMISSED** with prejudice.

### H.  Count XII – Common Law Negligent Training and Supervision

Finally, Defendants argue for the dismissal of Count XII, styled as a common law claim for negligent training and supervision.  (ECF No. 37 at 23.)  Defendants argue first that Plaintiffs' claim fails because, as far as negligent retention is concerned, Plaintiffs' cannot show that any employee of the City or the Department acted wrongfully or that Former Chief Cooper or the City failed to conduct a reasonable investigation into any employee's background.  (*Id.*)  Further,

Defendants argue that Plaintiffs have not produced any evidence that any subordinate of Cooper or the City "negligently harmed Walter or Vivian," which is required to show in a negligent training or supervision claim.   (*Id.* at 24.)   Defendants additionally assert that Plaintiffs similarly cannot show that Cooper or the City had "notice of any employee's propensity" to injure others or failed to take action.   (*Id.*)

In response, Plaintiffs assert that they "have put forth ample evidence" to overcome summary judgment on this claim.   (ECF No. 41 at 36.)   First, Plaintiffs state that the City and the Department knew that Officer Ouma was "insensitive to the needs of others," based on his pre-employment psychological exam.   (*Id.*)   Next, they argue that Ouma "had been arrested on more than one occasion, had no background in law enforcement and barely met the minimum standards for becoming a police officer."   (*Id.*)   Further, Plaintiffs argue that Ouma "displayed his lack of knowledge" and "refused to answer the simplest of law enforcement questions."   (*Id.*) Therefore, Plaintiffs posit that it was "foreseeable" that Ouma would "use excessive force."   (*Id.*)

West Virginia recognizes a cause of action for negligent hiring, training, supervision, and retention.   *See McCormick v. West Virginia Dept. of Public Safety*, 503 S.E.2d 502, 506 (W. Va. 1998).   "The torts of negligent retention and supervision are distinct from the theory of an employer's vicarious liability for an employee's torts."   *Radford v. Hammons*, Civ. Action No. 2:14-24854, 2015 WL 738062 at *6 (S.D. W. Va. Feb. 20, 2015).   Rather than holding an employer vicariously liable for an employee's wrongdoing, these torts focus instead on the culpability of an employer for "retaining or failing to adequately supervise an employee whom the employer knew, or should have known, posed a risk to third parties."   *Id.* at *7.   "Generally speaking, the torts of negligent retention and supervision follow that of general negligence claims:

38

The analysis examines whether the employer was on notice of the employee's propensity, yet unreasonably failed to take action, and the employee's tortious conduct results in harm to a third party." *Rhodes*, 2020 WL 4607323 at *5.

The West Virginia Supreme Court articulated the following "test" for claims of negligent retention:

> When the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*State ex rel. West Virginia State Police v. Taylor*, 499 S.E.2d 283, 289 n.7 (W. Va. 1997). Similarly, "negligent supervision requires a showing that the employer failed to properly supervise the employee, and that the employee proximately caused injury to the plaintiff." *Rhodes*, 2020 WL 4607323 at *5.

A reviewing court must consider "the nature of the employee's job assignment, duties and responsibilities." *McCormick*, 503 S.E.2d at 507. The duty of the employer increases "as the risks to third persons associated with a particular job increase." *Id.* The nature of police work is subject to this heightened duty, as police officers are "permitted to carry guns, use necessary force to effect arrest, and enter civilian residences in certain circumstances." *Woods v. Town of Danville*, 712 F.Supp.2d 502, 515 (S.D. W. Va. 2010).

Plaintiffs have failed to demonstrate that there is a genuine dispute of material fact that would save this claim from summary judgment. Plaintiffs have focused their response on the City and Cooper's retention and hiring of Ouma. Plaintiffs have not identified any training or supervision that was allegedly deficient or negligent, and a review of the record similarly does not

39

reveal any such deficiencies.   Therefore, the Court concludes that Defendants' motion is **GRANTED** as to the negligent training and supervision claim.

Plaintiffs' "ample evidence" as to the remaining negligent hiring and retention claim lacks any sort of reasonable or logical connection to the claim itself.   Plaintiffs' are quick to point to a pre-employment psychological screening that indicated that Ouma was "insensitive to the needs of others."   (ECF No. 41 at 36.)   This statement, in the Court's view, is a mischaracterization of the evidence presented.   The summary statement of Ouma's psychological evaluation does state that Ouma "appears to be somewhat insensitive towards others," but it also goes on to conclude that he has a "supportive social network," "does not appear to have any difficulty in creating and sustaining positive relationships," and that there was "no evidence of significant psychopathology or emotional adjustment difficulties that would impair his performance as a police officer."   (ECF No. 46–4 at 2.)   Plaintiffs do not identify any of these other statements, nor do they argue how a "lack of sensitivity" would put the City or Cooper on notice of any propensities of the employee. Plaintiffs, inadvertently or otherwise, have also conceded that the City and Cooper required Ouma to undergo a psychological evaluation as a part of the hiring process, a rather detailed look into Ouma's background to determine whether he would be a good candidate for employment.   (*See also* ECF No. 42 at 4.)

Plaintiffs are also quick to point out that Ouma has been arrested "on more than one occasion."   (ECF No. 41 at 36.)   By his own admission, Ouma was arrested twice: once for an unpaid parking citation in the State of New York, which was dismissed(ECF No. 42 at 4–5), and the other for a verbal argument with his then-girlfriend, which was also dismissed without any charges being filed.   (*Id.* at 5.)   Plaintiffs do not attempt to show how these arrests would have

any impact on Ouma's ability to be an effective police officer, or how this specific history should have put the City and Cooper on notice of any of Ouma's propensities for anything.

Plaintiffs next assert that Ouma had no law enforcement background and "barely met the minimum standards for becoming a police officer." (ECF No. 41 at 36.) Plaintiffs offer no evidentiary support for these statements, and the Court is perplexed as to their relevance. First, while it is true that Ouma had no prior law enforcement experience before attending the state police academy, so too do many—if not all—first-time officer hires. Moreover, a check into Ouma's background also revealed that he been successful while working in real estate and as bartender/manager, and that he was further never disciplined while in the Air Force Reserves. (ECF No. 46–4 at 2.) But Plaintiffs, in attempting to argue that Ouma was entirely unqualified to be a law enforcement officer, also admit that he did meet the basic qualifications for becoming a police officer. Further undermining their argument, however, Plaintiffs' have neither identified any of these standards nor shown how close Ouma was to these standards. What is apparent from the record, however, is that Officer Ouma attended and graduated from the state police academy, (ECF No. 46 at 11–12), and received approximately 920 hours of training, (ECF No. 46–3 at 1–3). Plaintiffs' assertions simply have no basis in the record before the Court and fall well short of creating any dispute regarding any material fact. *See Lester v. City of Gilbert*, 85 F.Supp.3d 851, 865 (S.D. W. Va. 2015) ("However, Plaintiffs do not explain why the extent of Glanden's training and certification would be relevant to the question of how he was supervised in the execution of his duties, nor do they present any evidence that a lack of training or of certification was a proximate cause of the conduct alleged here.").

Finally, Plaintiffs argue that Ouma's answers or non-answers in his deposition demonstrate a "lack of knowledge" and his insensitivity, but do not cite to anything specific.   (ECF No. 41 at 36.)   While on paper there appears to be several instances where this deposition became contentious, there are an equal number where he did not understand the question or did not seem to understand the process of a civil deposition.   (*See, e.g.*, ECF No. 42 at 4, 9.)   The Court is perplexed how these answers or non-answers should have put the City and Cooper on notice of anything regarding Ouma, when the deposition occurred over four years following his hire. There simply is no logical connection between Ouma's non-answers in a deposition in this matter to his hiring four years prior and certainly no connection to how this would provide notice to Cooper or the City.

Far from presenting a genuine dispute of material fact, Plaintiffs have instead highlighted that not only did Ouma attend and graduate the police academy, but also that the City and Cooper did their due diligence in hiring him as a police officer.   Officer Ouma has received over 900 hours of training and passed a psychological evaluation that showed "no evidence of significant psychopathology or emotional adjustment difficulties that would impair his performance as a police officer."   (ECF No. 46–4 at 2.)   Even if the Court accepted these arguments *arguendo*, Plaintiffs have still failed to show any connection between the evidence and the City and Cooper's decision to hire Ouma or how that evidence would make any violence or excessive force by Ouma foreseeable.

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Count XII of Plaintiffs' complaint.   Count XII is hereby **DISMISSED** with prejudice.

*IV.*     *CONCLUSION*

For the reasons more fully explained above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.   (ECF No. 36.)   Counts I(a), I(b), IX, X, and XII are hereby **DISMISSED** with prejudiced.   Additionally, the 25 unnamed "John Does" are hereby **DISMISSED** from this action with prejudice.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 10, 2021

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE